is United States v. Jones, docket 19-6182. Council, please proceed when you're prepared. Good morning and may it please the court. I'm Ryan Vee. I represent the appellant Scott Jones. We're asking the court to reverse the district court denial of Mr. Jones' motion to suppress based on the illegal search that was conducted of his grandfather Gerald Jones' shop by Deputy Merriman and Special Agent Brown. As this court goes in New York v. Payton, excuse me, Payton v. New York, the Supreme Court announced the test when officers are executing an arrest warrant, not a search warrant, for an individual when they believe they live at the residence or staying at the residence of a third party. And there's two factors that must be met for that. One, the officers must have an objectively reasonable belief that the person is residing at the residence, staying at the residence, and at the time of the entry, the time of the search, that the person is there. With respect to that, there's some important factual things that I think we have to sort out today. First is the tip. We've characterized that tip from the bail bondsman who contacted Deputy Merriman as an anonymous tip, and the United States characterizes it as not anonymous because it comes from a bail bondsman. However, the record is clear that the bail bondsman was not the primary source or the person with first party knowledge that Mr. Jones was residing at but instead the bail bondsman received information from another source and relayed that to Deputy Merriman. And the problem here is that Deputy Merriman did not investigate the source of that tip, did not conduct the analysis that this court has required in Gaye, Valdez, and other cases, essentially engaging into a face-to-face discussion with the informant, finding out the informant's basis of personal knowledge. In Gaye and other cases, the informants often accompanied the officers to the residence or location and told them that the individual was present at the time and was therefore accountable if the tip was incorrect or inaccurate. And in addition, is there anything in the record that the tipster was anything but anonymous to bail bondsman himself or that this tipster had previously given credible information to the bail bondsman? There wasn't anything in the record in that regard, Your Honor. Whether the bondsman knew this tipster from previous interactions, got the tip himself anonymously, it's simply unclear. And it was certainly the United States' burden at the trial court to present that evidence to state and test that the informant was reliable, had a basis of knowledge, and could test the informant's veracity. Don't we have other evidence from the poll camera in the testimony of the special agent about the video on the poll camera of the defendant living at his grandfather's residence? Yes, Your Honor, we do have other information. I would suggest that it's not necessarily clear that that meant Mr. Joseph that there was a poll camera coming and going from the location. It was not clear in the testimony. What is the standard? Isn't it just simply a reasonable belief that the person is living there and the FBI agent was specifically asked if he believed from the poll camera evidence that the defendant was living there. He said yes. Isn't that sufficient? No, it's not, Your Honor. You state the standard correctly. It is an evidence from which an objective person could determine he was living there. Is the video from the poll camera in the record? I think no, Your Honor. It was simply testified about by the special agent at the suppression hearing. So we don't have the video as part of record itself. We simply have the agent's testimony about what he saw on the video. And certainly, I think, you know, had he testified to more information, it might have met the standard. But here what he testified was that he saw him coming and going and there were a few times he had his shirt off and on or changed shirts. And I would suggest to the court that because this is a shop, it's not in and of itself a residential building. It was a private shop owned by Mr. Jones' grandfather. Tell me what that means. It was a private shop. Was it operated as a business? No, Your Honor. It was not operated as a business. It was an outbuilding, a structure on Mr. Jones' property that was like a very large garage or shop where you might do mechanical work. Wasn't there a testimony that there was a bedroom in it? Yes, once the officers entered the shop, and it's sort of divided, right? In fact, the United States supplemented the record with a photo. And if you look at the photo, the half with the door, the man door where you would enter, had a residence on that side. And the other half with a very large garage is where the- Would the deputy have had a better vantage point to see the defendant had the deputy looked in the window to the door, the swinging door, as opposed to the garage door? Or did the deputy get an advantage by looking in the garage door? I think he got an advantage, Judge. And I think that's the problem in this case. We talk about the Hardina's rule, the Girl Scout rule, if you will, walking up to that human door, that man door, had he looked in that window, he would not have seen Mr. Jones because the residence and the garage area, I say residence, the place where there was a bedroom, was partitioned. So had he looked into the man door, he wouldn't have seen Mr. Jones. The testimony was he looked in the garage window and Mr. Jones was sitting in the garage area on a chair. And I think that's the other problem, Your Honor, with the government's argument, is they argue that it was appropriate to approach this facility, garage building, and look through the garage door. And I think if you study what Justice Scalia said in Hardina's, you can't do that. You could walk up to the front door and knock. Whether you could look into that front door, as you suggest, Judge, is a question I'm not sure that's been decided. But I think there's some dicta that suggests that might be all right. But then if you're looking in other windows of the property, that is not covered by the implied license talked about in Hardina's to approach a residence and knock on the door. Let me ask you, let me ask you a question about this shop and the outbuilding and the grandfather had a home right by the shop, not a separate building. Is that right? That's right. There were a number of residences and one of those was the grandfather's. And at one point, the grandfather, who had been a diesel mechanic, as I understand it, had run a business in that shop. Is that correct or not? I don't know if he'd actually run a business. He may have done some work there pursuant to business. But whether the shop itself was a business for invitees to come to is unclear from the record. Right. Well, when you mentioned Hardina's and the Girl Scouts, that is a picture with a sidewalk leading to the front door. And of course, here, what we have is just a big, huge parking lot in front of this shop, which essentially is the whole thing seems like a sidewalk to the front door. But the shop, one thing that Justice Scalia centered on was the doorbell or a door knocker is an implied license, an invitation to come to the door. Was there anything like that on this shop building that would be an invitation to come to the door? No, Your Honor. Other than its proximity to the street, that's really it. There was no signs indicating a business that's open. If it were an auto shop, a sign on the door, so somebody could walk up to the door and come in and have their car worked on. There was nothing indicating that it was open for business or something that even a Girl Scout might want to knock on the door and try to sell Girl Scout cookies to or hang a door knocker or anything like that. Now, does any of that matter? Does any of that matter as far as, or I guess I should say, if there was a reasonable belief that he was living there? I think it does matter, Your Honor. I think for a number of reasons, you know, one, whether it's actually a residence that Mr. Jones was staying in, but two, if it is a residence, you know, then I think it has to be treated like any other residence for purposes of Hardina's rule, in that you cannot look into the garage door window of a residence. There's no implied license to do that. And that's critical here for the second prong, because the government argues that the second prong was essentially met when the officers looked into the garage window and saw Mr. Jones, in addition to the other facts that they have. But I would submit to the court that you can't use the view into the garage window because that's outside of the implied license in Hardina's. Why is it? Why is it if the, if in Hardina's, the sidewalk went right by a window and then you got to the front door, the officer presumably could have looked in the window as he walked to the front door. And the same thing's true here, depending on where the officer parked in front of that shop, right? If the officer had parked on the far side and then walked all the way past all of these garage windows, would then arrive at the door. Why isn't that good enough? Well, I think because of the testimony of the officer was that until he peered into the garage window, much like you're looking, you know, for the glare, he couldn't see Mr. Jones. Is that the testimony? That there was a glare and he had to put his face up against the glass? No, your honor. Admittedly, it wasn't. I think what he said was he peered into the garage window and that's when he saw Mr. Jones, but there certainly was not testimony that he could have seen him and had he walked up, you know, I guess it was ambivalent or there wasn't testimony that he could have if he just drove up to the garage and got out of his car. Could he have seen into that window? We don't have that evidence in the record and the district court, I think importantly, did not consider the peering into the window, looking into the window as part of its analysis. The district court expressly said it wasn't going to rule on that, but found that the two prongs of the patent test were met and denied the motion to suppress. And I think that, you know, the question of whether this was curtilage, whether you treat it as a residence or a commercial private commercial building or an out building connected to a residence was never passed upon by the district court. So to the extent the court agrees that it should reverse, you know, there may be a need to remand for further findings regarding that curtilage, but I think that the evidence the court has from the photographs supplied by the government demonstrates that this was curtilage and in the language of Hardina's that Justice Scalia speaks to very clearly and identifies even more in footnote four responding to the dissent, suggests that one would not have an implied license to look into a garage window simply walking up to a door. Is there evidence in the record that the law enforcement officers knew that this inside of the shop had been partitioned and that there was a some some form of a residence, I assume there was there was at least a chair to sit in and a bed, whether there's a bathroom, I don't know. Did the officers know the layout where they could say indeed someone could live inside of this shop? No, there wasn't any evidence of that other than the tip that he was living in the shop. There was no information before they approached the shop that they knew the layout, that they knew there was a bed, that there was a partition between the bed and the shop, that that information simply wasn't available. With that, I'd like to reserve the remainder of my time for rebuttal. Thank you. Mr. Krieger, when you're ready, please proceed. May it please the court. Thank you, Mr. Krieger. On behalf of the United States, the district court properly denied Mr. Jones's motions to the press and properly found that police had reason to believe that he both lived in or resided in the shop and that he was present at the time when police executed the arrest warrant. As to the first prong, the government submits that both the tip by Mr. Stevens, the bail bondsman, as well as the poll camera video testified to by Special Agent Brown provided independent and sufficient information on their own, but when viewed in conjunction along with reports by victims of Mr. Jones's other crimes, clearly provided an objective reason to believe that he resided there, that this was a special location to him. Let me ask you about the poll camera because that evidence is pretty vague to me, which is to say that we have the agent saying that he has seen the defendant there and that he's seen him come out in a different shirt than he is. We have the agent saying, here's what he drove and what kind of car, and we noted that that car was there overnight on several occasions or something like that. In other words, the poll camera is great for putting him at that scene, but I don't know that it's so great as far as establishing a reasonable belief that he lives there. Could you speak to that? Yes, Your Honor. The testimony was that on numerous occasions, Mr. Jones entered and exited in various stages of dress, that he entered on numerous occasions in one outfit and exited wearing a different outfit. Keeping in mind that the standard here is less than, more likely than not, less than probable cause, it's a reason to believe the fact that somebody is going into a building, changing clothes, is going into a building or coming out of a building partially dressed on numerous occasions, I would submit provides that objective reasonable belief that they're residing. Is it possible that they're not? Yes, but even if it's more likely than not, that is a much higher standard, as this court has explained, than the reason to believe standard. And so the fact that he's going in, coming out in various stages of dress, maybe he didn't have a car, maybe he parked the car in a location outside of the range of the poll camera, but the fact that he's going in, coming out on numerous occasions over this period of time in various stages of dress, indicates that he provides an objective reason to believe that he is residing. That is a special location that he has that or they have a foosball table or something. But let me ask you, do you agree with council that there's not evidence that the law enforcement officers had any idea until they went inside the shop that indeed there was a living quarter, whether a bed, a chair, maybe a toilet, I'm not sure? I don't believe the record is that clear as to the specific layouts. Obviously there was clothing in there, multiple pairs of clothing for him to be able to go and go out and change clothing in there. But as to the specific layout, I don't believe that's in the record. Council, I want to ask you a question about the assault victims that you're relying on. What did what did they say? I mean, other than they were taken there and beaten up by him, I mean, did they have a did they have, did they say he's living there? Did they provide a description of the premises, anything like that? I believe they identified the specific location as to whether or not he's living there. I don't believe they said that, but this court has explained that in terms of the patent analysis, residency isn't just he's living there. Residency is that this is a special place for him, a place and the fact that he's bringing victims of his crime to this location, even if he's not living there, shows that this is a place where he feels safe, the place where he retreats to to commit his criminal activities. As to one of the, I think, big disputes between Mr. Jones and the government should have investigated and that because the government didn't investigate the source of Mr. Stevens' tip, this court should disregard it. This court explained in United States v. Coral that police have no requirement, and it doesn't render an informant statement per se inadmissible, if police don't inquire into the source of the informant's information. What Mr. Jones would have this court do is treat the bail bondsman, a private citizen, as a police officer and require the police to treat him and his source as though he was a police officer as a government official. But that's not the case we have here. We have a citizen informant who was known to police and that citizen informant, the bail bondsman, had provided police accurate information in the past and he went with police to the location to see that Mr. Jones and Ms. Chavez were arrested. As is clear in the record, Mr. Stevens had been the bail bondsman for both Ms. Stevens and Mr. Jones for a long period of time. In fact, he had a vested interest in this case in seeing that Ms. Chavez was arrested to get the money that he had set up for the purpose of the bond. Let's talk about his tip a little bit. His tip's a little shaky, isn't it? He didn't say to the... He says to the officer something to the effect of, I heard they're living in the shop, right? It was something to that effect. And I know they're there. Right. I believe both ways. You said Judge found out or how he knew that? That was never elicited on the record. I'm not... So I can't say that, yes, it was that he told that to W.E. Merriman. Okay. But this goes back to this court in the United States and Quarles said that police don't have to inquire into the informant's basis of knowledge. Well, I agree, but at some point the police become a little... Maybe their case is not as good in like where you are now. If they don't inquire, if they do inquire and somebody says, yeah, I talked to his mother and she said he's living there. I mean, that could be pretty strong for the police to rely on that. But if you don't know the source, I mean, it seems like it might be a little less strong for you. Well, as the Supreme Court has said, there are three, essentially three factors that go into an informant, the ability to use an informant's testimony and how credible that informant is. Their veracity, their reliability and their basis of knowledge. And the Supreme Court in this court have explained that a failure in one here, a failure in learning the basis of knowledge is not the end all be all. The failure to prove one of those factors or show one of those factors can be made up for by proof on the other two factors. And here we have both veracity and reliability because he's a citizen informant and citizen informants are presumed to be reliable. We have an individual who's provided accurate information in the past, showing his veracity, showing that he's known to have been a good informant. It's quite possible that it might be detrimental to Mr. Stevens' career as a bail bondsman and potentially to his usefulness to the police to force them to reveal his sources because he might be getting information from individuals who don't want their name getting back to the police. I'm happy to answer any more questions with regard to the first prong. And if there aren't any... Let me ask you a question real fast. Does all of this just come down to the windowpeak, which is to say all of the talk about the home and Peyton and so forth, the officer would be allowed if it had just been the deputy alone who'd gotten the call from the bail bondsman. I heard he's in there and the deputy drives over there to do a knock and talk. There's nothing against that. Correct. And goes up to knock on the door, having parked on the right side of the building and walked past all the garage windows and saw as he went to the front door, oh, there he is. Could have just gone in and gotten him, right? Correct. And so, doesn't it all come down to the windowpeak? I would submit that is by far the easiest way this court could affirm. And the reason I say easiest way, the district court concluded based on the three facts that I was just discussing, that provided reason to believe. I'll admit that the government would be relying on all inferences being drawn in its favor to affirm on that basis. But as far as the windowpeak, yes, that's by far the easiest way to affirm. And this court in Reeves v. Churchage said that looking into a bedroom window didn't constitute a search. After Jardines, this court in United States v. Dupree said looking inside a window didn't constitute a search. And so, in a published case before Jardines and an unpublished case after Jardines, this court has said looking into a window was perfectly fine. And so, ultimately, to sum up my answer to your question, Judge Phillips, yes, it comes down to the window. And if Deputy Merriman can walk past the window and look in, I would submit the case is closed and the court should affirm. Unless the court has any further questions, that was essentially what I was planning on about the second part of the question. I do have a question. Was the picture of the shop submitted to the district court for review? Yes, Your Honor. It was, I believe, Government's Exhibit 1 at the evidentiary here. Okay. I guess there is one last thing I'd like to say about that picture, somewhat in response to Judge Phillips' question, or at least proposition, which is pulling up to the right-hand side. If you look at the picture, there is an overhang where a vehicle is parked, suggesting that that would be what would amount to a driveway for this structure. There is a large enough ramp that you could pull up anywhere in but that would be where cars would pull in to park, ultimately. And so if somebody were to pull in behind that car porch or that overhang and walk to the front door, they would pass right in front of the overhead door. One last question on the picture, which is, I'm still confused where he was sitting in this chair. Was it directly behind the most left garage window or was it directly behind the swinging door, the typical door? It was behind the overhead door, which window in the overhead door, I'm not sure. I don't think the record clearly states, but it is. Oh, I'm sorry. Please. It is the overhead door that Deputy Merriman looked through. And do you concede or is the record plain about whether the deputy could have seen him sitting in that chair from the glass in the swinging door? I don't believe that's in the record. I can tell you from talking with the trial prosecutor that there would have been a discrete hallway. And so if you look solely into the, what's been dubbed the man door, the normal swinging door, you would have seen a hallway. That being said, to follow up on that, I believe Special Agent Brown testified based on his observations of the video footage that he had seen Mr. Brown go in and come out of the overhead door on numerous occasions. So that door was also being used for entry and exit by people. You tried to cede time, but we didn't let you. Thank you, Mr. Crater. Counsel. Thank you, Your Honor. I think I agree that the case can be decided based on looking in the window of the garage door. And I think the cases the government cites are clearly distinguishable and reviewing Hardina's, looking in the garage window the way the agent described he did would be inconsistent with the implied license as Justice Scalia described it in the opinion as well as in footnote four. And the Churchage case was a case in which this court decided that when the officer saw into a duplex, he was not in the cartilage. Here, the officer is clearly within the cartilage. So it's a distinction. The other case that the government cites, McDowell and Dupree are also distinguishable on numerous factual grounds. And essentially, this is not an issue that's really been decided post Hardina's. But because it was cartilage and violated the implied license, the court should reverse. I see that I'm out of time. Thank you for your arguments. I don't know for the questions. The case is submitted.